## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **ANGELA M. DOWNING,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )          **Case No. 11-CV-495-PJC** |
| | ) |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) |
| **Social Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |

### OPINION AND ORDER

Claimant, Angela M. Downing ("Downing"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her application for benefits under the Social Security Act, 42 U.S.C.

§§ 401 *et seq.*  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to

proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the

Tenth Circuit Court of Appeals.  Downing appeals the decision of the Administrative Law Judge

("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that

she was not disabled.  For the reasons discussed below, the Court **REVERSES AND**

**REMANDS** the Commissioner's decision.

### Claimant's Background

Downing was 37 years old at the time of the hearing before the ALJ on June 4, 2010.  (R.

37, 39).  She had completed high school and two years of community college in three separate

programs: cosmetology, certified nurse assistant, and certified medication assistant.  (R. 39-40).

Downing had previously worked as an office manager, as a telemarketing supervisor, and had

held various positions in customer service, including management.  (R. 55-57).  Downing was

terminated from her last position as a benefit analyst for a human resources department in September 2008, allegedly during an economic downturn, and received unemployment benefits for approximately a year-and-a-half.  (R. 44-45, 55).  Downing also indicated that she had lost other jobs due to attendance problems and from an inability to complete tasks due to forgetfulness and an inability to focus.  (R. 45-46, 53).  Downing testified that she looked for employment but could not find a job that she could handle.  (R. 45-46).

Downing testified that she suffered from panic attacks, anxiety, and headaches.  (R. 42, 47).  She described sometimes getting dizzy from her panic attacks and headaches.  (R. 42, 49-50).  Downing testified that she used to get headaches at least twice a month, but was doing better and had them only once a month.  (R. 42-43).  She testified that the headaches could last most of a morning and that she took Lortab for them because she did not have insurance and could not afford the migraine medication.  (R. 43).  Downing testified that her panic attacks could be triggered by being around too many people, by having too many people trying to talk to her, and from dealing with her children.  (R. 50).  She also testified that she was irritable and had angry, verbal outbursts.  *Id*.  Downing described some difficulty sleeping, getting anywhere from four to six hours of sleep at night.  (R. 54).

According to Downing's testimony, being around people made her anxious.  (R. 47-50).  She described physically shaking, sometimes sweating, and wanting conversations to end quickly.  (R. 49).  She testified that she deliberately isolated herself and felt safer at home.  (R. 51).  Downing estimated that was away from home approximately eight hours a week to run errands, visit a friend or neighbor, or to do something for her children.  (R. 46-47).  Downing testified that she tried to do most of her shopping at small stores, but would sometimes go to

Wal-Mart during off-peak hours in order to avoid crowds.  (R. 47-48).  Downing would go to her children's school assemblies, but would stand by the door because of the crowd.  (R. 49).

Downing described having difficulty with her memory and feeling overwhelmed because she had too much to do.  (R. 53-54).  She testified that she would sometimes make a list to help her remember things or that her mom would call to remind her of appointments or to take her medication.  *Id.*  Downing testified that she did most of the household chores, but sometimes had difficulty with completing tasks.  (R. 50, 54-55).  Her children had a chore list and sometimes a friend would help her get caught up.  (R. 50-51).  Downing cooked, but primarily made small, simple meals or frozen dinners.  (R. 51).  Downing testified that her interaction with her children had decreased over time, and that she would sometimes go to her room for a break.  (R. 52).  Her parents and friends would help with the children occasionally.  (R. 51).

One of the first medical records Downing submitted was for a follow-up visit with Stephen A. Miller, D.O. on February 22, 2007. (R. 228).  Dr. Miller changed Downing's anti-depressant prescription from Prozac to Cymbalta.  *Id.*  It was noted that Downing was taking Relpax for migraines as needed.  *Id.*  On March 1, 2007, Dr. Miller noted that Downing was unable to afford the Relpax and had requested a prescription for Vicoden, which he then prescribed.  (R. 226).

On March 9, 2007, Downing presented to Jane Phillips Medical Center ("Jane Phillips") with complaints of high blood pressure.  (R. 232-39).  Her initial blood pressure was recorded as 164/100,[1] and two hours later, it had lowered to 135-89.  (R. 236-37).  She was discharged with a

---

[1] Normal blood pressure is in the recorded range of 120/80.  *Taber's Cyclopedic Medical Dictionary* 243-44 (17th ed. 1993).

prescription for pain medication and a diagnosis of hypertension and cephaligia.[2] (R. 238).

Downing returned to Jane Phillips approximately two weeks later on March 22, 2007, for chest

pain with shortness of breath, cough, ear pain, and a headache. (R. 240-43). She was diagnosed

with bronchitis and migraine headaches and prescribed an antibiotic and pain medication. (R.

241).

On April 24, 2007, Downing saw Brad Jarrell, M.D. for complaints of migraine

headaches. (R. 254-55). Downing reported she had migraines at least twice a week, which made

her feel like her head was going to explode, and were sometimes accompanied by throbbing,

nausea, or dizziness. (R. 255). She also reported they were sometimes associated with blurry

vision and sensitivity to light and sound. *Id*. The headaches were reportedly triggered by stress,

allergies, or weather changes and would last most of a day unless stopped by medication. *Id.* In

addition to her problems with migraines, Dr. Jarrell noted Downing's history of asthma,

hypertension, depression, anxiety, and difficulty sleeping. (R. 254-55).

Downing had follow-up visits with Dr. Jarrell on May 8, 2007 and June 12, 2007 to

monitor her migraine status and hypertension. (R. 253-54). On August 10, 2007, Dr. Jarrell

treated Downing for an upper respiratory tract infection. (R. 253). At that appointment,

Downing requested documentation excusing her from work for whenever she had migraines. (R.

253).

On September 3, 2007, Downing presented to Jane Phillips with complaints of arm and

leg pain as well as headache. (R. 249-51). Downing was prescribed pain medication and

instructed to follow-up with her physician. (R. 251). On September 18, 2007, Downing saw Dr.

---

[2] Cephaligia is a medical term for headache. *Taber's* at 349.

Jarrell for her leg pain.  (R. 252).  Downing described the pain as intense, sometimes excruciating, and coming from her bones.  *Id*.  She reported that she had trouble sleeping and that the pain could bring her to tears.  *Id*.  After examination, Dr. Jarrell diagnosed Downing with leg pain of uncertain etiology.  *Id*.

On October 4, 2007, Downing was examined by M. Ryan Vaclaw, M.D., with Primary Care Associates ("PCA") for increased leg pain.  (R. 271-72).  Downing described the pain as severe, sharp, stabbing, and aching, with no precipitating, aggravating, or relieving factors for it.  (R. 271).  Dr. Vaclaw diagnosed her with neuropathy and prescribed her pain medication.  (R. 272).

On November 13, 2007, Downing had a follow-up appointment at PCA with Mark D. Erhardt, D.O.  (R. 268-70).  Although Dr. Erhardt noted that Downing "felt well with minor complaints, [she] ha[d] decreased energy level, [was] sleeping poorly, and [was] gradually worsening."  (R. 268).  Downing complained of "bone pain" in her thighs and heels, especially in the morning.  *Id*.  Dr. Erhardt renewed her pain prescriptions and ordered additional labwork.  (R. 269).

Downing had a follow-up appointment with Dr. Erhardt on November 29, 2007.  (R. 265-67).  Downing had been off all of her medications to determine whether they had been causing her pain and neurological side effects.  (R. 265).  Downing's blood pressure was recorded as 158/100, and she reported that home blood pressure readings had been poor and that she was not feeling well.  *Id*.  She also reported an increase in depression "associated with change in job, difficulty sleeping, episodes of spontaneous crying, feeling tired, financial difficulties, lack of energy, palpitations, and recent changes in life. . ."  *Id*.  Dr. Erhardt diagnosed Downing with

hypertension, depression, and adjustment disorder with mixed anxiety and depressed mood. (R. 267). He also noted that he completed a request for a leave of absence from her employer because she was caring for her son with emotional problems. *Id.*

On July 17, 2008, Downing presented to Jane Phillips to treat a migraine. (R. 285-87). She described the headache as severe and throbbing, exacerbated by bending over and moving her neck. (R. 285). She was discharged with a prescription for pain medication. (R. 287).

On October 18, 2008, Downing had a counseling session at Grand Lake Mental Health Center ("GLMHC") with Blob Blasdel, MS, LMFT. (R. 358). Blasdel described Downing as having a depressed mood and tearful affect. *Id.* Downing reported that she had recently felt overwhelmed, "lost," "paralyzed," had racing thoughts, difficulty concentration, and had no motivation. *Id.* She described getting only 2-4 hours of sleep each night, and feeling irritable, tired, having a poor appetite, and being anxious. *Id.* Downing also reported not wanting to be around others, isolating herself, and not answering the phone. *Id.* Downing reported difficulty functioning at her job and stated she "forgot how to do [her] job." *Id.*

On November 3, 2008, at an appointment with Wendie Clemens, MA, LPC, at GLMHC Downing was again described as depressed and with a tearful affect. (R. 357). Downing reported that she did not feel like herself and was worried about the impact her depression and irritability had on her children. *Id.* Downing expressed regret that her life and her children's lives had not turned out the way she wanted. *Id.*

On November 11, 2008, Downing went through the intake process at GLMHC with Clemens. (R. 334-50, 356). She reported experiencing daily depression, irritability and had angry outbursts. (R. 337, 344, 349). According to Downing, she isolated herself from others,

-6-

including her children, and punished or yelled at her children more frequently.  (R. 337, 344, 346-47, 349-50).  She again expressed feeling guilty about the impact her behavior had on her children.  (R. 337, 347-49).  Downing stated that she had become increasingly confrontational and had become more cautious and protective of herself and her children due to a previous history of abuse. (R. 337, 345-46, 348-50).  Downing reported that she felt chronically tired, weak, and unmotivated, and would get only a few hours of sleep each night.  (R. 337, 344, 347-49).  She also stated that she had an ongoing problem of being easily distracted and unable to concentrate or focus, which caused her difficulty in completing tasks.  (R. 337, 344, 348-49).  Downing reported that she had lost her job the previous month because of those problems, which caused her to have low self-esteem.  (R. 337, 344, 356).  Downing was diagnosed by Clemens on Axis I[3] with major depressive disorder, without psychotic features, and posttraumatic stress disorder.  (R. 335, 349).  Downing's Global Assessment of Functioning ("GAF")[4] score was listed as 47, with 48 being the highest in the past year.  *Id.*

On November 12, 2008, Downing saw Weldon Mallgren, DO, for pharmacological management.  (R. 332-33).  Dr. Mallgren noted that Downing was experiencing "pretty severe depression" and anxiety and wanted to return to work.  (R. 332).  Dr. Mallgren adjusted her

---

[3] The multiaxial system "facilitates comprehensive and systematic evaluation."  Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 27 (Text Rev. 4th ed. 2000) (hereinafter "DSM IV").

[4] The GAF score represents Axis V of the multiaxial system.  *See* DSM IV at 32-34.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100.  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id.* at 34.

medication regimen.  (R. 332-33).  At her next appointment with Dr. Mallgren on January 7, 2009, Dr. Mallgren noted Downing still had symptoms and he increased the dosage of her medication and added Clonodine for anxiety.  (R. 327-28).

Downing had appointments with two different psychiatric social rehab specialists ("PSRS"[5]) at GLMHC on December 17, 2008 and February 4, 2009. (R. 354-55).  During these visits, Downing discussed her history of abuse, difficulties with her children, and her financial struggles due to unemployment.  *Id.*  Downing also had an appointment with Dr. Mallgren on February 4, 2009 and she reported that she was stressed from losing her housing and that one of her medications was causing her to feel too sedated.  (R. 324-26).  Dr. Mallgren adjusted her medication, noting Downing's "continued mood instability."  (R. 324).

On February 9 and February 25, 2009, Downing had appointments at GLMHC with two PSRS.  (R. 352-53).  Downing reported feeling very depressed and had continuing financial problems, including having her water turned off for being unable to pay the bill and relying on local charities for assistance.  *Id.*  Downing reported crying for hours every day, rarely leaving the house, and preferring to sleep than do anything else.  (R. 352).  She also expressed concern that she had cancer or heart problems but could not go to a doctor because she had no insurance. *Id.*

Downing had a phone session with Kristy Feeler, BS, PSRS, of GLMHC on March 3, 2009.  (R. 351).  Feeler noted Downing was in a dysphoric mood, emotional, and had some difficulty communication her thoughts.  *Id.*  Downing reported that she cried nonstop, had

---

[5] *See* http://www.glmhc.net/employment_id64.html (last accessed September 20, 2012) (identifying "PSRS" as a psychiatric social rehab specialist).

problems completing her daily activities, and was very fatigued, which she attributed to her medication, and caused her to spend the majority of the day sleeping, even when her children were home. *Id*. Downing reiterated her ongoing financial difficulties. *Id*.

The following day, on March 4, 2009, Downing had an appointment with Dr. Mallgren. (R. 319-23). He noted that Downing presented "in a somewhat melodramatic fashion with a lot of complaints about struggling with little relief [and] with unusual reactions to medication." (R. 319). Dr. Mallgren noted that although Downing denied suicidal ideation, he was concerned about her and discussed crisis and inpatient procedures. *Id*. He discontinued her medication and added Abilify with Doxepin for her depression and Lyrica for anxiety. (R. 319-23).

On March 5, 2009, Downing presented to Lifespan Medical Clinic ("Lifespan") with complaints of migraine, high blood pressure, and shoulder and knee pain. (R. 288-89). It was noted that she had been on-and-off her blood pressure medication, had rotten teeth, and was being treated for depression and anxiety at GLMHC. She was discharged with blood pressure and pain medication. (R. 288).

On March 19, 2009, Downing was admitted to Jane Phillips for increased symptoms of depression and suicidal ideation, believing that her family would be better off if she were dead. (R. 290-309). Downing was tearful and reported that she had been though a lot and could not take it anymore. (R. 306). She described feeling frustrated, overwhelmed, hopeless, helpless, unmotivated, unable to concentrate, had racing thoughts and flight of ideas, and had increased memory problems and difficulty sleeping. (R. 290, 292-93, 297). It was noted that she had become withdrawn, labile, irritable, had trouble being around others, and was easily angered. *Id*. She reportedly would become violent and belligerent and had torn up a room during an outburst.

(R. 290, 293).  Downing and her family feared that she might harm herself or her children.  *Id.*

During the course of her hospital stay, Downing's mood and affect improved and she was discharged on March 30, 2009 with diagnoses of bipolar disorder and generalized anxiety disorder.  (R. 290-92).  Her GAF score upon admission was assessed at 15, but had increased to 60-65 upon discharge.  (R. 290, 294).  It was noted that her prognosis was good given her response to treatment and her good support system.  (R. 292).

The following day, on March 31, 2009, Downing met with Feeler at GLMHC and reported that she felt better and that although she still cried daily, it was for shorter periods of time.  (R. 423).  Downing also reported that her mood swings had decreased and she was more calm with her children.  *Id.*  However, she did report an increase in anxiety since her discharge from the hospital and was very worried about her financial state.  *Id.*  Downing reiterated her financial concerns at her next appointment as well and indicated she had applied for disability benefits for herself and for her son.  (R. 418).  Downing reported that she no longer slept all day but did need to take frequent breaks and complained of severe anxiety.  *Id.*  She told Feeler that she did not believe she could handle any type of employment.  *Id.*

Downing had follow-up appointments with Dr. Mallgren on April 4 and April 29, 2009.  (R. 311-18).  He noted that she had been admitted to Jane Phillips, but that she was doing well on her medication.  (R. 311, 315).  Similarly, on May 6, 2009, a nurse from GLMHC noted that Downing did not report any difficulty with her medication and that they had worked well since being discharged from the hospital.  (R. 417).

On May 14, 2009, Downing called Feeler because she "need[ed] someone to listen and talk to."  (R. 414).  Feeler noted that Downing was "very emotional" and "needed to be calmed

down several times as she sounded as if she was going to hyperventilate." *Id*. Feeler also noted that Downing had a labile affect, sad mood, poor attention span and had loose associations in her thought process. *Id*. Downing reported that all she had been doing was sleeping or crying and believed she might need to go back into the hospital. *Id*. Downing reported that her parents were going to come to town to intervene and help her care for her children as she was unmotivated to even prepare meals. *Id*. Despite difficulty paying her bills, Downing expressed doubt that she could function in a job. *Id*. She stated that she couldn't "even make [her]self do anything at home and [she] really couldn't see [her]self being able to handle work." *Id*.

On May 26, 2009, Downing met with Feeler at GLMHC. (R. 395-403, 411). Downing reported daily problems with anger, anxiety, severe depression, and with her memory. (R. 398, 411). She described frequent feelings of hopelessness, helplessness, worthlessness, worry, fear, irritation, distraction, fatigue, cried daily and had suicidal thoughts 3-4 times per month. *Id*. She also reported isolating herself, not wanting to be around others, and rarely leaving the house. *Id*. Downing continued to report financial difficulties and did not believe she could handle the stress of having a job. (R. 398). Feeler noted that Downing was emotional, with a sad mood and flat affect, and had continuing diagnoses of major depressive disorder and post traumatic disorder. (R. 396, 411). Downing's GAF score was assessed at 45, with 48 being the highest level in the last year. *Id*. On June 16, 2009, Feeler signed a letter stating that Downing was "not able to work at this time due to her mental conditions." (R. 379).

On July 6, 2009, Downing presented to Lifespan with complaints of bronchitis, jaw pain, and increased blood pressure. (R. 435-54). She reported that she had recorded a blood pressure reading of 165/103, though it was measured at only 122/78 at Lifespan. *Id*. It was noted that

-11-

Downing was crying during the visit due to stress of being unemployed and difficulty handling her son, who had ADHD.  (R. 454).

Downing met with Feeler at GLMHC on July 16, 2009 and reported severe mood instability, irritability, and agitation.  (R. 407).  She also reported daily depression and feelings of helplessness, hopelessness, and fatigue.  *Id*.  Downing commented that she had been denied disability benefits and continued to express concern regarding her finances.  *Id*.  Feeler noted that Downing was "very emotional" and had an irritable mood and flat affect.  *Id*.

On September 14, 2009, Downing had an appointment with Feeler at GLMHC and reported that she cried for hours every day and had not been able to keep a job.  (R. 404).  As noted by Feeler, Downing's primary concern was her financial situation and her inability to afford to have her water turned back on.  *Id*.

On November 12, 2009, Downing reported to Feeler that she continued to have daily depression, anger, anxiety, and problems with her memory.  (R. 436, 440).  Downing described feeling helpless, hopeless, unmotivated, fearful, worried, overwhelmed, agitated, and felt suicidal 2-3 times per month.  *Id*.  Feeler noted that Downing reported difficulty trusting others, being paranoid in large crowds, not liking to have her back to others, not wanting to be around others, isolating herself, and rarely leaving her home.  *Id*.  Downing also reported not wanting to get out of bed, showering only once a week, not cleaning her home, not having an appetite, and crying daily.  *Id*.  She did report looking for employment even though she did not believe she could mentally handle it.  *Id*.  Downing's diagnoses continued to be major depressive disorder without psychotic features and post-traumatic stress disorder, and Feeler noted that her prognosis was guarded due to sporadic participation and continued isolation.  (R. 438, 440).  Her GAF

-12-

score was assessed at 46.  *Id*.  A week later, on November 18, 2009, Dr. Mallgren noted that Downing still had anxiety and stress and that she was withdrawn and depressed.  (R. 433).  Dr. Mallgren also noted that she was suicidal without a plan or intent, and that she had a dysthymic mood and anxious affect.  *Id*.

On December 15, 2009, Downing presented to Gemini After Hours Clinic with complaints of a migraine and was provided a prescription for Lortab.  (R. 456).   The following day, on December 16, 2009, Downing met with Feeler and Dr. Mallgren at GLMHC.  (R. 428-430).  Feeler noted that Downing had a flat affect, sad mood, and was withdrawn.  (R. 430).  Downing reported feeling depressed, drained, fatigued, unmotivated, hopeless, and helpless.  *Id*.  She also reported sleeping a lot of the time and not liking to take so many medications.  *Id*.  She continued to complain of financial struggles, but did report emotional support from her family and best friend.  *Id*.  Dr. Mallgren noted Downing had a euthymic mood, congruent affect and that her medication was working well.  (R. 428).

Downing presented to Lifespan on January 14, 2010 to monitor her blood pressure.  (R. 451-52).  Downing's blood pressure was recorded at 190/106 and she reported that she had run out of her medication.  (R. 451).  She also complained of pain in her hands, wrists, hips, and knees.  *Id*.  She was directed to continue taking her medications as prescribed.  (R. 452).

On January 19, 2010, Dr. Mallgren completed an agency form, Medical Source Opinion of Ability to do Work-Related Activities.  (R. 449-50).  He opined that Downing had "difficulties functioning in society" and had marked limitations in her ability to perform at a consistent pace and/or maintain regular attendance.  *Id*.  Dr. Mallgren also indicated that she had moderate limitations in her ability to understand, remember, and carry out simple and detailed

instructions, and in her ability to interact appropriately with the public or co-workers.  (R. 449).
He marked numerous symptoms Downing suffered from, including, but not limited to, memory
difficulties, sleep disturbance, personality changes, mania, persistent anxiety, decreased energy,
paranoia, anhedonia, panic attacks, difficulty concentrating or thinking, illogical thinking,
intrusive thoughts, mood disturbance, emotional lability, blunt or flat affect, hostility or
irritability, and oddities of thought, perception, speech, or behavior.  (R. 450).

Downing missed several appointments at GLMHC in the first part of 2010, causing her
medication to be discontinued.  (R. 469-70, 473-80).  On April 20, 2010, Downing met with
Feeler and reported excessive mood swings, depression, lack of motivation, difficulty
concentrating, inability to finish a task, and rarely leaving her home.  (R. 471).  Downing also
stated she had been looking for a job but expressed doubt that she could handle employment due
to her depression and inability to concentrate.  *Id*.

On May 3, 2010, Downing had an appointment with a physician assistant at GLMHC and
complained of depression, unstable moods, and angry outbursts.  (R. 459-60).  Having been off
of her psychotropic medication, new prescriptions were prescribed, which she picked up on May
11, 2010.  (R. 457, 460).

Non-examining agency consultant Deborah Hartley, Ph.D., completed a Psychiatric
Review Technique form and a Mental Residual Functional Capacity Assessment dated June 3,
2009.  (R. 360-77).  On the Psychiatric Review Technique form, for Listing 12.04, Dr. Hartley
noted Downing's bipolar disorder and depressive syndrome, which was characterized by
anhedonia, sleep disturbance, difficulty concentrating, and thoughts of suicide.  (R. 360, 363).
Dr. Hartley noted for Listing 12.06, that Downing had anxiety, with a history of post-traumatic

stress disorder.  (R. 360, 365).  For the "Paragraph B Criteria,"[6] Dr. Hartley found that Downing had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and noted no episodes of decompensation.  (R. 370).  In the "Consultant's Notes" portion of the form, Dr. Hartley reviewed Downing's report of symptoms, her history of mental health treatment, and her ability to complete activities of daily living.  (R. 372).  Dr. Hartley noted that "due to stress it is hard [for Downing] to want to take care of personal needs but she is able to cook, clean, and shop."  *Id*.  She also noted that Downing had trouble with authority figures and with written and spoken instructions, but was able to pay attention for 30-45 minutes.  *Id*.

On the Mental Residual Functional Capacity Assessment, Dr. Hartley found that Downing was markedly limited in her ability to interact appropriately with the general public and in her ability to understand, remember, and carry out detailed instructions.  (R. 374-75).  She also found that Downing was moderately limited in her ability to maintain attention and concentration for extended periods of time.  (R. 374).  Dr. Hartley opined that Downing could "understand and carry out simple instructions under routine supervision," and that she was able to relate superficially to supervisors and co-workers for work purposes, but not with the general public. (R. 376).

---

[6] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

On June 3, 2009, non-examining agency consultant Kenneth Wainner, M.D., completed a case analysis and determined that Downing's physical impairments, including her hypertension and headaches, were non-severe.  (R. 378).  On September 28, 2009, non-examining agency consultant Sally Varghese, M.D., affirmed Dr. Wainner's opinion.  (R. 425).  Similarly, on October 5, 2009, non-examining agency consultant Luther Woodcock, M.D., found Downing's physical limitations were not severe impairments.  (R. 426).

## Procedural History

On March 15, 2009 Downing protectively filed an application for disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.*  (R. 14, 114-17).  Downing alleged the onset of her disability began October 6, 2008.  (R. 117).  The application was denied initially and on reconsideration.  (R. 67-69, 76-78).  A hearing before ALJ David W. Engel was held June 4, 2010 in Tulsa, Oklahoma.  (R. 31-66).  By decision dated July 8, 2010, the ALJ found that Downing was not disabled.  (R. 14-25).  On June 20, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[7]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin*

*v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

---

[7] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The

court "may neither reweigh the evidence nor substitute" its discretion for that of the

Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Downing met the insured status requirements through June 30, 2013.

(R. 17).  At Step One, the ALJ found that Downing had not engaged in any substantial gainful

activity since her alleged onset date of October 6, 2008.  *Id.*  At Step Two, the ALJ found that

Downing had severe impairments of migraine headaches, hypertension, anxiety and a mood

disorder.  *Id.*  At Step Three, the ALJ found that Downing's impairments, or combination of

impairments, did not meet a Listing.  (R. 18-19).

After reviewing the record, the ALJ determined Downing had the RFC to perform a

range of medium work, with the exception of her ability to "perform simple tasks with routine

supervision, relate to supervisors and peers on a superficial work basis, cannot relate to the

general public, and can adapt to a work situation."  (R. 14).  At Step Four, the ALJ found that

Downing was not capable of performing her past relevant work.  (R. 23).  At Step Five, the ALJ

found that there were jobs in significant numbers in the economy that Downing could perform,

taking into account her age, education, work experience and RFC.  (R. 23-25).  Therefore, the

ALJ found that Downing was not disabled from October 6, 2008 through the date of his decision.

(R. 25).

## Review

Downing raises issues regarding the ALJ's consideration of the opinion evidence, the

ALJ's RFC determination, and the ALJ's credibility finding.  The Court finds that the ALJ's

decision must be reversed because it did not sufficiently address the opinion evidence of Dr. Mallgren and Dr. Hartley, and therefore, the issues Downing raises regarding the RFC determination and credibility finding are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id*; *see also Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished) (*citing* SSR 96-8p, 1996 WL 374184).

The Court finds the ALJ's treatment of the opinion evidence to be inadequate because it consists almost entirely of boilerplate[8] provisions:

---

[8] A very recent discussion of boilerplate provisions in decisions from the Social Security Administration is found in *Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012). In *Bjornson*, the Commissioner's brief described the language that was the focus of the arguments as a "template," meaning a "passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains." *Id*. at 644-45. Judge Posner authored the *Bjornson* opinion and stated that "[t]he Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'" *Id*. at 646. The *Bjornson*

> The record does not indicate what records Dr. Mallgren based his opinion on. While the undersigned has carefully considered Dr. Mallgren's opinion, it cannot be given controlling weight because it is inconsistent with the treatment records and indicate the claimant is more limited than the objective evidence reflects. The undersigned gives great weight to the opinion expressed by [Dr. Hartley]. This opinion supports the above residual functional capacity based upon the medical records contained in this record.

(R. 23).  The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision.  *Id.*  Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered."  *Id.*

Ironically, the ALJ criticizes Dr. Mallgren's opinion for not being tied to specific records, yet fails to give any examples of why he found Dr. Mallgren's opinion inconsistent with Downing's treatment records.  (R. 23).  While this is a facially valid reason for rejecting Dr. Mallgren's opinion, without discussion and examples from the ALJ explaining his reasoning, the Court is deprived of the ability to give meaningful review of the ALJ's decision.  *Langley*, 373 F.3d at 1121-22. The Court has reviewed all of Downing's treatment records, and no glaring conflict is obvious to the Court.  In the same vain,  the ALJ gives "great weight" to the opinion of non-examining agency consultant Dr. Hartley because he finds it consistent with Downing's medical records.  (R. 23).  Yet again, the ALJ provides no explanation of how Downing's records support Dr. Hartley's opinion but not Dr. Mallgren's.  Because the ALJ failed to explain

---

opinion also favorably quoted the Tenth Circuit case of *Hardman*, discussed in the text, on the troubling nature of boilerplate language.

or identify what the claimed inconsistencies or consistencies were between the opinions of Dr.

Mallgren and Dr. Hartley and the other substantial evidence in the record, his reasons for

rejecting Dr. Mallgren's opinion in favor of Dr. Hartley's are not sufficiently specific to enable

meaningful review. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

Another Tenth Circuit case criticized similar boilerplate provisions used by the ALJ here.

*Martinez v. Astrue*, 422 Fed. Appx. 719, 726 (10th Cir. 2011) (unpublished).  The *Martinez* court

recounted the relevant factors set forth in SSR 06-03p that the ALJ is required to consider in

deciding what weight to give to treating physician opinion evidence.  *Id.*  The court said that the

evidence cited by the ALJ in giving the provider's opinion little weight revealed that he did not

have the relevant factors in mind.  *Id.*  In the present case, as in *Martinez*, the ALJ did not

discuss relevant factors such as the length of time Dr. Mallgren had treated Downing and the

frequency of their contacts, how his opinion was consistent/inconsistent with other evidence,

whether relevant evidence supported his opinion, and Dr. Mallgren's qualifications as a

specialist in mental health.  Again, by solely using boilerplate provisions here, the ALJ did not

provide any true analysis, and this Court has nothing to review.  *Langley*, 373 F.3d at 1123

("Because the ALJ failed to explain or identify what the claimed inconsistencies were between

[the treating physician's] opinion and the other substantial evidence in the record, his reasons for

rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review

his findings.").

The importance of the ALJ's failure to link the weight given to the opinion evidence to

specific evidence is highlighted by the ALJ's minimal discussion of Downing's treatment

records.  It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence

favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability.  *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007).  A bare conclusion, without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to discuss the evidence and give reasons for the conclusions. *Clifton*, 79 F.3d at 1009.

In discussing the records from GLMHC, the ALJ mentioned only three select visits over a three-month period of time and highlighted only Downing's concerns regarding her finances and noted that her medication was reportedly working.  (R. 22).  The ALJ failed to discuss Downing's numerous (over 20) other visits at GLMHC over a seventeen month period where Downing consistently complained of severe symptoms.  The ALJ mentioned only in passing Downing's eleven-day inpatient hospitalization for suicidal ideation.  (R. 21-22).  The ALJ had a duty to discuss this medical evidence, including the information stated above, that tended to support Downing's claim of disability.  *Martinez*, 422 Fed. Appx. at 724-25.

The Commissioner offers many reasons, with specific evidence, why Dr. Mallgren's opinions are not sound.  But these reasons, and especially the references to specific evidence, were not included in the ALJ's decision or reasoning.  The Court will not engage in *post hoc* attempts to save the ALJ's decision by supplying rationales that the ALJ did not supply.  *Carpenter*, 537 F.3d at 1267 ("*post hoc* rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance").  The ALJ's decision must

be reversed so that the ALJ can properly consider the opinion evidence.

Because the errors of the ALJ related to the opinion evidence requires reversal, the undersigned does not address the other contentions raised by Downing.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Downing.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 25th day of September, 2012.

Paul J. Cleary
United States Magistrate Judge

-23-